Case number 417-0672. And is that name pronounced Hassebrock or Hassebrock? Hassebrock. Okay. Michael Hassebrock and Andrea Hassebrock versus McGregor, Springfield Clinic, and Russell. And for the appellant, we have Mr. Wood. Is that correct? Yes. And for the appellee, I have the name Ms. DeGrand. That's correct. All right. And you also have counsel joining you? Yes, ma'am. I have counsel. Okay. Thank you, counsel. And you'll be doing the arguing? Yes, ma'am. All right. You may proceed, counsel. This is a case about Kaya Hassebrock, a great young girl who died when she was only five years old. I represent her parents, Andrea and Michael. Other parties of interest include Jackson, her brother, and Nicole Schlater, her sister. We're asking the court for a new trial because of defendant's failure to comply with Illinois Supreme Court Rule 213 and the trial court's failure to adequately sanction the defendants for the nondisclosure. Kaya was born premature at 26 weeks. This led to a number of complications important for our purposes that she had hydrocephalus, which is an abnormal accumulation of fluid in her ventricles, in her brain. She was unable to essentially absorb the CSF, which is cerebral spinal fluid, on her own. This led to a VP shunt being placed, a ventricular peritoneal shunt, which went from her ventricles to her peritoneum, which allowed the spinal fluid to be reabsorbed into her body. This shunt worked well for the most part, but it's obviously an issue in the case here. January 2006, she had a hospitalization here at St. John's Hospital in Springfield. That is at issue in this case. She was hospitalized for what were believed to be complications from her tonsillectomy and adenoidectomy. After a couple of days, doctors suspected that she might have a necrotic bowel, a dead bowel. Essentially, they were going to do a surgery to try to repair that or remove the dead part of the bowel. Because of that, they elected to externalize her shunt, because they didn't want it to be infected and have the infection go to her brain. Dr. Pensick, one of the neurosurgeons, externalized that on the 8th. Soon after, Dr. Russell, one of the defendants in this case, overtook management for that shunt. He was responsible for the management of the shunt until the 18th when he left for vacation. Then another one of the defendants, Dr. McGregor, took over for him for four days. Then Dr. Russell took over again when he got back from vacation. Essentially, what the plaintiff's allegations were, Dr. Russell ordered the shunt clamped on January 12th. Essentially, what his order was, was that he ordered the shunt clamped after 150 cc's of cerebral spinal fluid were drained in a day. But how he put the order was he was going to allow for 50 cc's drained per 8-hour shift. He did that because the nurses had 8-hour shifts. That would be the easiest way, in his opinion, to do that. You, I, Kaya, we all produce cerebral spinal fluid, but we don't produce it in a constant stream. Essentially, if you sneeze, if you're angry, you produce more. There are certain situations where you produce less, but there was no room for difference in terms of Dr. Russell's order. If you look through the chart, some of the 8-hour periods, the fluid did not even drain all the way.  On the other ones, there was 50 cc's drained within a couple hours. If this happened, then the shunt was clamped and no fluid was allowed to drain the rest of the 6 hours in the shift. So our allegations, and Dr. Waldman was our expert, that the clamping and unclamping led to an increase of pressure in Kaya's head that eventually led to her to have these terrible seizures, which led to a brain death, which led to her death. The allegations in this case were not that the clamping or the order itself was negligence. Dr. Waldman said he had seen that done and it was within the standard of care. The allegations were that there was a failure to monitor Kaya. Throughout her hospitalization, there were physical symptoms of increased pressure in her head. She had fevers, she had intermittent irritability, she had neurological symptoms, high deviation, and perhaps most importantly, she had an increase in the dilatation of the ventricles. Essentially, her ventricles got bigger, which the doctors would tell you is a sign of increased intracranial pressure. So that's essentially what the facts were. We're alleging that Dr. Russell and Dr. McGregor did not adequately monitor her, did not order enough CTs, did not change the clamping order. Dr. Russell did eventually clamp. I did eventually amend the order, but it wasn't until after she had the seizures. He did this on the 25th, 26th, after she had the huge seizures, which plaintiffs would contend caused her death. This case was tried in February of 2017. I can say this with all humility because I essentially carried Mr. Kelly's bag. This was a very well-tried case on both sides. I did a couple of witnesses, but it was a very well-tried case on both sides. And I thought except for one issue that it was very well judged. We only essentially have one claim of error here. And the trial court essentially did the right thing initially, but we don't think he went far enough. The defense expert, and I usually say expert because they had two 213F3 experts. One of them, Dr. Cortez, his direct exam was six pages long, and three or four of those was on introduction. And he just said that, oh, it was caused by her seizures. Essentially the same thing the plaintiff experts were saying, except for slightly different. Dr. Engelhardt was their expert on standard of care. This case was filed in 2007, and it was not until February 21, 2017, when Dr. Engelhardt was on the stand. This is after plaintiff's case in chief, when anyone had ever suggested that the management of Kaishan at St. Louis Children's was somehow improper. Dr. Engelhardt. Counsel, I want to make sure we're all on the same page about what occurred when the violation occurred, and what the trial court did, and what was asked of the trial court at the time. Yes. And I want to be clear on that, because I wrote the brief, and it wasn't artfully written. One sentence in there, and they were correct in pointing out that. And essentially the trial court granted all the relief Mr. Kelly requested initially, right when it happened. Mr. Kelly asked that it be stricken. That that specific testimony be stricken. That that specific testimony be stricken, and it was stricken. Then they continued with the testimony. About a page later, Dr. Engelhardt says, well, I can't answer that. That's the issue that's been stricken, kind of bringing it out again. Prior to going to lunch, and in our reply brief, I kind of put out the circumstances in terms of this kind of quick timeline. So are you taking a position that there was not an opportunity at the initial time that the relief requested was granted to ask for the additional relief? Is that your position? Because, I mean, that seems to be where you're going in your reply brief with the lunch break and all of that. Yeah. I mean, that's part of it, Mr. Kelly. It was on a time crunch. I do not believe anything was waived. I don't think the trial court, if you read his ruling, thought anything was waived in terms of the request for additional relief. We're not suggesting the trial court erred in the initial striking. That's what we asked for. After there was another mention of the striking, and sort of just having a little bit more time to think about it, Mr. Kelly, plaintiff's counsel, moved for the additional relief that we believe is that issue in this case. And the additional relief would be in line with this court's rulings in White v. Garlock and somewhat to the face of Eloy. This court has been very strong coming down on Rule 213 violations. What's interesting about this situation is I don't think there's any dispute. There wasn't from the trial court, if you read his comments after lunch, that this testimony was wholly undisclosed. They made the initial argument that, well, it's coming on cross-examination, you get what you ask for, that sort of thing. And the trial court essentially went with that. But as soon as Mr. Kelly showed the trial court and counsel, White v. Garlock in this case, they agreed it was controlling. They agreed it hadn't been put forth. I think what we're essentially getting at, and I'll read directly from Judge Kavanaugh's comments, and obviously he's defending his ruling, he says, the only issue I perceive at this time is whether or not once the bell has been rung, so to speak, whether or not the jury can strike the testimony in their own mind and not consider it. This was an important issue in the case, obviously, to cause a death. It was a complete bombshell from our perspective. We knew that the defendants were claiming that she essentially had her brain death in St. Louis, but the plaintiff's position is we had very good evidence that it did not, that it occurred at St. John's. We had the St. Louis Children's radiologist saying that on CT at St. Louis Children's it showed the stroke, or the brain death, and that on CT it doesn't show up for 24 to 48 hours, which would put it back at St. John's. And that was a huge issue in the case. I mean, you had witnesses going back and forth to see where the brain death occurred. Obviously, the St. John's doctors who were defendants here, they wanted to put it as far away from them as possible. She was fine when she left St. John's, and it all happened in St. Louis Children's. But what was never disclosed was that the shunt management at St. Louis was somehow at fault. And actually, it was the complete opposite. So it's your position that this testimony constitutes a violation of Rule 213? Yes. And you asked for relief based upon that violation? Yes. What's the standard review for this court regarding whether the trial court acted appropriately regarding the violation of Rule 213? Your position that it would be de novo based on the fact that the facts are not really at issue. How can you argue de novo on 213 violations? What case law supports that? In the very cases you cite that I wrote, it suggests it's not de novo at all. White v. Garland.  Well, if it's this court's position, obviously, that White v. Garland and Pigsby v. Eloy are abusive discretion, then this case should be abusive discretion as well. Well, it's troubling that you argue otherwise. In White, one of the biggest differences between this and White is in White, the trial court found the violation of 213 and decided that a new trial was appropriate given the nature of the violation. As I recall, this court wrote, yes, this is a, the trial court had the discretion to make these calls and did not abuse its discretion in doing so. Wasn't that what we said in White? Yes, it was. Okay, go ahead. And obviously, there's a difference between White v. Garland. We're trying to have you go against the trial court in this situation. It's not helpful if you miscite the standard of review we're supposed to use. That wasn't done intentionally? Well, it's, intentionally or not, it seems clear that it's not a de novo standard. And you have to argue to us and contend that this was a violation of the trial court's discretion in deciding two things. One was their violation here of Rule 213, and two is so, what's the appropriate action to take? Sure. And counsel, in ruling, the trial court did speak specifically to whether or not he was of the opinion that the jury was able to disregard this evidence and whether or not they understood and, I guess, took to heart his instruction. Sure. So how do you satisfy the abuse of discretion? I mean, we can't go back and see the jurors as the trial court did and make that assessment. I don't know how he was able to look in the jurors' eyes and found that they were able to disregard his statement. I don't know. I mean, but he did say that. I'm looking at that right now on the record 1131. He does say the jury seemed to understand that. The next sentence was the one I just read to you, though, and the only issue I perceive at this time is whether or not, once the bell has been rung, whether or not they can strike the testimony in their own mind. And we would argue that the subsequent reference to a striking and references in closing argument made by both defense attorneys as to we're not saying anything happening correctly in St. Louis, we're not blaming them, further highlighted that testimony. That's what our argument is, that there was a Rule 213 violation and it was not. Does it highlight to you detriment or to the good from the defendant's perspective? That's a good question. I would rule it that when you sort of say we're not saying X, that brings up X. It's not quite as egregious as this. We say we're not saying the defendant's had med-mal insurance, but whatever, moving on, just saying something that's inappropriate, we're not saying that I think would be putting it into the juror's mind. Essentially, this whole circumstance just injected an issue into the case that should not have been there. And the question is whether or not the court, without explaining to the jury why it was stricken, cured that. And I think it would be a clear case if the court refused to strike it, given this court's precedent, they would say that's a 213 violation on a very important matter in the case, and this should be reversed for a new trial. They have a 50-page response brief. I really think it comes down to just one issue, what this court thinks, whether or not they have all these other issues that are easily tossed away by White v. Garlock and Figs v. Eloy and other things. But the one issue is did Justice Kavanaugh's decision to strike the comment fully cure it? We're arguing that it did not, based on the prejudice, the import of that testimony, the fact that there's been 10 years, and that's the first time anyone's ever blamed anybody at St. Louis Children's, after St. Louis Children's doctors had already been videotaped and their evidence depositions had been given. They had no chance to defend themselves in terms of their conduct. And not only that, Dr. Engelhardt's disclosure, which was actually written by defendants. It wasn't a report. In the disclosure, it says Dr. Engelhardt will testify that Drs. Russell and McGregor managed the shunt in the same way they did at St. Louis. Now, plaintiffs should have that expectation that there will be no complaints about St. Louis shunt management if the same person who's defending the standard of care for Russell and McGregor says that they did it the same way as St. Louis. And in fact, Mr. Drake, who is lead trial counsel for Dr. Russell, when he was cross-examining plaintiff's expert, Dr. Waldman, said, you know, people do things differently when they manage a shunt. You know, he even said in his questions, he said, you know, Dr. Russell did it the same way they did it in St. Louis, and you do it a different way. So people do it different ways. He even said that. So they were trying to highlight that they were similar, and here they have their expert come later and say, well, that was the wrong way to do it, and that actually caused Tya's death, which had never been an issue in the case. Our witnesses were all gone. There was no, I mean, we had nobody to rebut that testimony at that time. So due to the fact that that issue was put into the case, Justice Kavanaugh even mentioned a couple times in the record, in his denying plaintiff's post-trial motion, that he wished that issue hadn't made it into the case. He says that right in there, but that it was a well-tried case, and I think, whatever. But he wished that he hadn't made it into the case. Well, it did make it into the case, and for that reason, we're asking that for a new trial. Thank you. Thank you, counsel. You may proceed. Good morning, Your Honors. Karen DeGrand on behalf of the Defendant Appellants, Dr. McGregor, Springfield Clinic, and Dr. Brian Russell. May it please the Court. Counsel. Hi. Justice Steigman and Justice Holder-White have sort of stolen my thunder a bit here, because the first thing that I wanted to say to the Court is what plaintiffs seem to be advocating is almost a mandatory rule that removes the trial court's discretion in addressing a 213 objection. That if, in the event the court finds a disclosure violation, according to plaintiffs, the trial court must hold an evidentiary hearing. No violation can be handled by striking the testimony and admonishing the jury. So what I, in the scheme of appropriate appellate review, it's our position that plaintiffs counsel, or rather plaintiffs have asked the Court to truly not just disregard the trial court's view of the case, but also to discard the rest of the record, which truly indicates that to the extent that this comment was made, very brief, that it could have prejudiced the plaintiff. Do you concede that it was a violation? I don't, Your Honor. I don't. Then why? Okay, I will. I'm mindful of the Court's precedent on this issue. I would cite to the 213G distinction from 213F the way that the testimony came in was on cross-examination. The question about what caused the seizures, this is a question or an issue that had been documented and testified to over and over again, that it was a defense position that what happened, what went wrong, went wrong in St. Louis. Whatever it was. I'm sorry? Whatever it was. Whatever it was. And there's not, there wasn't, and even this very undeveloped comment, which was cut off quickly because of the timely objection and also the Court quickly conducting a sidebar, was not a statement that somebody in St. Louis was improper or negligent or anything of that nature. That just wasn't the comment. It wasn't in a couple of times in the briefs, plaintiffs call it, sort of change the testimony a little bit and call it mismanagement. Well, that's not what Dr. Engelhardt said. But certainly, so that combined, so that's, he comes out, he says that, that there's another part, and at that point, according to the briefing that we have before us, plaintiffs contends that none of, you know, he didn't know that there, he didn't believe that there was another part, and then proceeds to invite the witness to elaborate on that. So, you know, I would say this, it's an academic question, I suppose, because as to whether there's an actual violation or not, because the trial judge treated it as if it was a violation. And, you know, from the very, from the very get-go, struck the testimony, told the jury to disregard it, I think a couple of times, even at that very, even at the beginning. So, what we have here is a situation where there's an objection, there's, there's a, you know, there's this elaboration of that's part of it, very short, I think six words or something to that nature, and the judge in no uncertain terms says to the jury, with regard to attributing cause of his demise, that last answer is stricken, you're not to consider it. The last response, you can't consider it, and you'll receive instruction on that later. And the, and as, as the record bears out, the, in addition to that admonishment, the instruction that the jury received later was the 1501, IPI 1501, which says to the jury, here's, here's how we define proximate cause. If, you know, the part of it, doesn't matter whether the alleged negligence is, is partially the cause, that is, that's what gets you to the end zone on proximate cause. So, it seems to me that, that the, the only way that the court could send us back for a new trial would be to make an assumption that the jury didn't pay any attention or disregarded the admonishment that came right after the testimony, and then also disregarded the definition of 1501 in the IPI instruction. There's, that's contrary to Illinois law. What's the, what's your thought about the closing argument? The closing argument, there's no objection made during closing argument, and I think the closing argument was completely consistent and appropriate, based on, and I think we go through, and maybe, and counsel mentions we had a long brief, we had a lot of places to show where the conduct and what, what happened in St. Louis was a big part of this trial. So, that's why those comments were totally appropriate, and there was no objection. What do you think about the trial judge's explanation about the jury's reaction to his instruction? Well, I'm, I'm in the same boat as this court. I wasn't there, and it's, it's a well-settled principle of Illinois law that that's why we have a deferential standard of review for this type of thing, because the, the trial judge, and the trial judge went out of his way to articulate this, that he, and I, and I think the trial judge gave it some serious thought and said, all right, at the post, you know, even initially, but then at the post, at the, not at the very first, well, we have the first sidebar, and then we have the lunchtime discussion. At the lunchtime discussion, the judge makes a comment that he thinks that the jury is paying attention and giving heed to his instruction, and then at the post-trial phase, after the judge had all of the briefs, all of the transcripts, and had a good think about it, he said, you know, I looked at those folks, and I could see that they were paying attention. They were a very hardworking, diligent jury, and so that's, and for that reason, he found no prejudice, and I think that we give heed to that. I'm sorry. The issue of this case is the cross-examination of Dr. Engelhardt when he was asked, do you think the fever has caused the seizures that led to the death right? And so that's part of it. What else is part of it? The management of the shunt at Children's Hospital in St. Louis. You are indicating, you indicated just a moment ago that you didn't think that was in violation of Israel 213 disclosures. Had he said that previously? He had not said, used the precise words, the management of the shunt in St. Louis. What had he said about it? What he said was that the injury occurred in St. Louis. So that the event, that there was an event in St. Louis, you know, sometime preceding 8 o'clock a.m. on January 27th. He was deposed at length prior to trial, was he not? He was deposed. That's correct, Your Honor. And so your representation is he referred to the events in St. Louis?  I believe that's correct, Judge. And did plaintiff's counsel at the deposition say, Doctor, what do you mean by that? No, I don't believe so. Was there any further clarification sought? I don't believe there was. And then that was also a topic of the briefing and also one of the comments that the judge made, you know, to the effect that at the very end of the deposition when, I believe it was Mr. Kelly, was sort of, you know, saying, do I have all your opinions? And, you know, and Doctor. And he said something like, you got most of them or what's the other? You know, he got the gist of it. You got it in a nutshell. And so, you know, so. But just to be clear. Right. Your reading of his deposition is this child was, if not okay, wasn't dying when she left Springfield. She was at baseline. She was at baseline when she arrived in St. Louis. She was at baseline. Okay. That's what the St. Louis record said. And that was relied upon by Dr. Engelhardt. Okay. So something happened in St. Louis that ultimately resulted in her death? That there was an event. An event. And it wasn't necessarily that somebody did something negligent. And it just was, that wasn't clarified. Well, there wasn't a claim that they did something bad, but for that she would have lived. The old empty chair kind of defense. It wasn't judged because it was, first of all, when we go to the empty chair, the 1204, we have a sole practicum in cause. And even to the extent of the stricken testimony, it was part. So, you know, again, I have to emphasize the instruction that the jury heard on proximate cause. That if the jury sat there and says, gosh darn it, I'm not going to disregard, you know, what does that judge know? I'm going to take exactly what Dr. Engelhardt said to heart. Oh, here's the instruction. It doesn't have to be the last or the nearest cause or the only cause, as long as it's part. So that's, I have to take issue with counsel's or with plaintiff's conclusion of prejudice. So your argument is, if I understand it correctly, that even if Dr. Engelhardt's testimony could have been viewed by the jury as pointing a finger of blame at the Children's Hospital in St. Louis for negligently handling Kaya, that still would not somehow exonerate what happened in Springfield if the jury found Springfield to be negligent? That's correct. And I don't think that that's what the testimony was. It certainly didn't go anywhere near that far. But to the extent that there was. But to the extent it might have, it wouldn't have mattered. It wouldn't have mattered because it was couched as part of it. It wasn't part. Was that discussed with Judge Kavanaugh at the hearing on all this? I believe that that came up at the post-trial fix. What did the judge say about it? I don't believe that he necessarily commented on that aspect of it. It was more generally on the jury following the admonition as opposed to the final instruction. But the, I just want to go back again because it's kind of a troubling vague term. Dr. Engelhardt referred to events in St. Louis. Is that what you're telling us? I think that's one of the ways he characterized it, yes. Characterized that her death was a result of events in St. Louis? And no one pursued that? Like, doctor, what do you mean by that? It's just kind of, you know, this is a deposition. I don't understand the absence of pursuing it. It's not as if you're in front of a jury, you know, the old business about don't ask questions when you don't know what the response is going to be. This is a discovery deposition. Well, and if I'm remembering the deposition testimony correctly, there was some discussion of St. Louis, but not of, I don't think it drilled into that much detail. Did the jury know what baseline means? I think probably from, there was enough testimony on it that the jury would have grasped it. Because they talked about, in terms of her being responsive to relatives and her pupils, and so they didn't just say baseline. No, that wasn't the only thing. But the idea would be that given the fact that everybody would concede she's seriously ill, that she's at a level that you would expect or hope her to be given her condition. Something like that? At that point, or that she wasn't, I mean, I think part of the plaintiff's theory was to point to a radiology report from a scan taken in St. Louis, and then there was a dispute about, well, does this show the timing of the infarct? Is that the blurring of the lines? That was the description, and then there was disputed testimony. All of this testimony, all of these nuances and outright conflicts, and no, that's not how I read it, yes, this is how I read it, that all went to the jury. But it seems to me that, again, the jury had a lot to hear about the defense of my clients, which was, you know, and it wasn't causation was a big issue, standard of care was a huge issue. And there's quite a bit of testimony that pertained to the standard of care, and there was extensive argument in closing by plaintiff's counsel as well as defense counsel about compliance with the standard of care. And, you know, Dr. Russell was on the stand for, I don't know, over a day possibly, it's a lot of pages of the transcript, just going through everything to explain the complicated situation that he and Dr. McGregor were addressing with a sick child. So I have to disagree with the plaintiffs on the impact of this. In my view, the court cannot reach a conclusion that the trial court abused its discretion even under, you know, the standards that are set forth by the Supreme Court in Sullivan and also by this court in the white fakes and crawl cases without doing some pretty serious shift in Illinois law. So we would ask that the court reject the plaintiff's arguments and leave intact the trial court's discretionary rulings and the judgment that was entered on the jury's verdict. And I'm happy to answer any other questions the court may have for me. I don't see any at this time, counsel. Thank you. Thank you. Any rebuttal, Mr. Wood? Yes, thank you. Just briefly, I want to touch on one of the things Justice Steigman was asking counsel about, regarding the discovery deposition of Dr. Engelhard. Your rulings, this court specifically, your rulings are well known. Mr. Drake, counsel, even referenced after Mr. Kelly was finished with his exam, he said, in the interest of full disclosure, I'll make sure I disclose everything. He even had Dr. Engelhard say again that Drs. Russell and McGregor were within the standard of care. I mean, he was very clear. Well, that might have not been said clearly, so I want to make it said. And he asked her again about her CT scans to make sure that he commented on those. Never mentioned anything about the management of the Shunt St. Louis. Well, let me direct you to respond to the thing that I find kind of disturbing. You heard Mr. Grand's reference to Dr. Engelhard's testimony about an event or the events in St. Louis. How is that not, it sounded to me like, geez, referring to something happened there that is significant. I don't understand at a discovery deposition, emphasizing the word discovery, how you let that hang. Because it sounds to me like, if I'm Judge Kavanaugh, I'm thinking, well, maybe that wasn't all that inconsistent since he referred to events with his later testimony that is the subject of all this. What was part of it? The management of the Shunt. That might be the event that Dr. Engelhard was referring to had anyone asked him to clarify it. But no one did. Why not? I've read the discovery deposition. I did not take the discovery deposition. I viewed it to be complete when I reviewed it. I do not know specifically what she's referring to, the events of St. Louis. I'm not denying that that's part of it. Is that what his testimony is in the deposition, the events in St. Louis? Why I'm a little troubled saying yes or no is that St. Louis was brought up so many times just in terms of her court. Assuming that phrase appears, doesn't that suggest that maybe the testimony that is the entire subject of this appeal may not be all that inconsistent? That depends on which party this court puts the burden on. Based on your own precedent, I would claim that it's the party with the expert that has the burden of getting out all the necessary opinions. They chose not to have Dr. Engelhard author an opinion. It was just a disclosure written by counsel. And then they offered a discovery deposition. Mr. Kelly questioned him on that. And then, as I mentioned, Mr. Drake felt the need to make sure they had everything out there. As he said, we want to make sure we've got everything out there. And so, you know, well, whether certain questions could have been asked, sure. Well, one of the differences in White was the testimony of the doctor there was directly contradictory. There was no question about it. No one challenged it. In this case, what I'm suggesting is maybe it's not only is it not directly contradictory, it might be fully consistent, which is a rather large difference. I would argue it's completely contradictory to their disclosure. Their disclosure says that Dr. Engelhard will testify that Drs. Russell and McGregor managed the shunt in the same way they managed the shunt in St. Louis. He also says that Drs. Russell and McGregor were within the standard of care. So that doesn't fly. That's the complete opposite by how I review it. And Mr. Kelly, I believe in the – it's part of the record, but I believe in the first break, even before lunch, provided Dr. Engelhard's disclosure into the record. And I believe Mr. Biswald, soon after, offered his discovery deposition so that the court could review that, if I remember correctly. And I would just say there's a big difference between saying something happened and saying someone was at fault. Because we know that the defense argument was that she had her brain death, the infarct, in St. Louis. That's what they were arguing the entire time. There's a difference between saying that there's someone at fault in St. Louis. And that's what we're claiming, that they were blaming an empty chair. We had rebuttal ready for something happened based on CT results that went back 48 hours. That's how our experts read them, that it showed that the brain death occurred between 24 and 48 hours prior to when the CTs were taken. We didn't have any rebuttal for someone saying that they mismanaged the shunt. She somehow died because of that, and that's what we're alleging. Thank you. Thank you, counsel. We'll take this matter under advisement and be in recess.